MACK MASON, APPELLANT, *v.* THE STATE
OF NEVADA, RESPONDENT.

No. 37964

August 9, 2002                                              51 P.3d 521

*David M. Schieck,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, and *James Tufteland,* Chief Deputy District Attorney, Clark County, for Respondent.

# OPINION

*Per Curiam:*

As discussed below, we hold that SCR 250(4)(f) requires the State to provide notice of all evidence it intends to introduce at a capital penalty hearing. The district court in this case erred in admitting certain evidence at appellant Mack Mason's penalty hearing without determining whether the State had good cause for not providing notice of it earlier. But Mason did not receive a death sentence, and we conclude that the error was not prejudicial.

## FACTS

Mason had been living with his aunt, Flora Mason, for a month or two when he moved out of her house in North Las Vegas in March or April 1999. On May 10, 1999, Flora returned home from work and found that her home had been broken into and ransacked. Her father's .38 caliber revolver and a neighbor's shotgun were missing. Earlier that morning, one of Flora's neighbors had seen Mason walk to the back of Flora's house. Mason reappeared ten or fifteen minutes later carrying a long object wrapped in a blanket or rug and walked away down the street. At around 10:30 a.m., Mason pawned the stolen shotgun.

Felicia Jackson encountered Mason that same day. Jackson first met Mason in 1995, and they became romantically involved. Jackson claimed that at some point she ended the romance but that the two continued to be friends. According to Jackson, Mason wanted to renew their romance around early 1999, but Jackson did not. He told Jackson that she "was not going to live in the same state with him and be with someone else." Jackson nevertheless began a romantic relationship in April 1999 with Dudley Thomas. Jackson testified that on May 10, Mason first approached her outside a store in North Las Vegas. She told Mason she did not want to talk with him and got into a car and drove away with Thomas. The two stopped at another location, and she sat in the passenger seat of the car while Thomas talked with some other men. Mason approached the car and lunged at Jackson with a knife. She fled out the driver's side of the car

and ran past Thomas. Thomas confronted Mason, and Jackson ran down an alley and eventually got a ride to Thomas's apartment.

Jackson further testified that that evening she and Thomas were in the bedroom of his apartment. Kevin Brown was in the front room of the apartment. Jackson was writing a letter, and Thomas was on the telephone when Mason walked into the bedroom. He asked Thomas if he still thought it was funny. Thomas said he didn't think anything was funny if Mason was trying to hurt Jackson. Mason said that he thought Thomas still thought it was funny, raised a gun he was holding, and shot Thomas in the head. Mason then grabbed Jackson and forced her out of the apartment. Mason later told Jackson that after their confrontation earlier in the day, Thomas had tried to run him over and had laughed.

Brown testified that Mason came to the door of the apartment and asked if Thomas was home. After Brown said he was, Mason pulled a revolver, pointed it at Brown, and told him to leave. Brown ran from the apartment and heard a gunshot. He soon saw Mason pulling Jackson by the arm up the street. Brown returned to the apartment and saw Thomas lying on the bedroom floor with blood on his head.

Mason had a friend give him and Jackson a ride to downtown Las Vegas. They rented a room at a motel. The next day they did some shopping, ate at a restaurant, and went to the bus station. Mason was interested in taking the bus to California, but the line at the bus station was long, so they left. Mason called his cousin in California from a pay phone and said that he was leaving Las Vegas because "he had got him a motherfucker." The cousin understood Mason's words to mean, "Actually done something to someone. You know, he was planning to get out of the State of Nevada. It obviously had to be something bad for him just to come to Sacramento."

Mason and Jackson then returned to the motel. The police had discovered their whereabouts and phoned their motel room. Mason would not answer the phone, but Jackson looked out the window and saw the police. The police then used a bullhorn and told Mason to allow Jackson to leave. He refused to let her leave and told her to get under the mattress of the bed. She did so. Mason then made a hole in the wall and tried unsuccessfully to squeeze through to the next room. After the police threatened to send in a police dog, he left the room and was arrested. Police later found a .38 caliber revolver in the air duct of the room. The bullet recovered from Thomas's brain was consistent with a .38 caliber bullet.

The day after his arrest, Mason was advised of his rights under *Miranda*[1] and gave a statement. At that time he said that on the

---

[1]*Miranda v. Arizona,* 384 U.S. 436 (1966).

night of May 10 he went to Thomas's apartment, picked up his girlfriend (Jackson), and left without incident. At trial, Mason testified that he had a key to his Aunt Flora's house, which he used on May 10 to enter and take the shotgun. He denied taking the revolver. He also testified that he went to Thomas's apartment that night and picked up Jackson. As soon as he and Jackson left, Jackson returned to the apartment for some reason. As Mason followed and came to the apartment, he heard Thomas shouting and saw him go into the bedroom with a machete in his hand. Mason heard a shot, entered the bedroom, and saw Jackson holding a gun and Thomas lying at the foot of the bed. Mason grabbed Jackson, and they left.

The jurors found Mason guilty of first-degree murder with use of a deadly weapon, second-degree kidnapping with use of a deadly weapon, and two counts of burglary while in possession of a firearm. They found him not guilty of grand larceny of a firearm. There was a penalty hearing because the State sought a death sentence. The jurors returned a verdict of life in prison without the possibility of parole. The district court accordingly sentenced Mason to two consecutive terms of life in prison without the possibility of parole for the murder as well as prison terms for the other three counts.

## DISCUSSION

### Various assignments of error

Mason claims that the district court erred in overruling his objections to three jury instructions. However, case law supports the use of all three instructions. First, Mason challenges the instruction on implied malice, arguing that it is vague due to its archaic language. This court has already considered and rejected this challenge.[2] Next, he challenges the instruction on reasonable doubt required by NRS 175.211(1). He argues at length that this instruction is even worse than the instruction deemed unconstitutional in *Cage v. Louisiana*.[3] He fails, however, to cite our decision in *Lord v. State*,[4] where we considered *Cage* and concluded that the two instructions were not similar and that the Nevada instruction is constitutional. Finally, he argues that the jury was improperly instructed that it need not agree unanimously on the theory of guilt, but we have repeatedly approved this statement of law.[5]

---

[2]*See Leonard v. State,* 117 Nev. 53, 78-79, 17 P.3d 397, 413 (2001).

[3]498 U.S. 39 (1990).

[4]107 Nev. 28, 38-40, 806 P.2d 548, 554-56 (1991).

[5]*See, e.g., Walker v. State,* 113 Nev. 853, 870, 944 P.2d 762, 773 (1997).

Mason also contends that the district court erred in refusing to instruct the jury that if the evidence is "susceptible of two reasonable interpretations, one of which would point to the defendant's guilt and the other would admit of his innocence, then it is your duty in considering such evidence to adopt that interpretation which will admit of defendant's innocence and reject that which would point to his guilt." This court has held that it is not error to refuse to give this kind of instruction where the jury has been properly instructed on the standard of reasonable doubt.[6]

Mason contends that the district court erred in admitting a photograph of the victim's body over Mason's objection. The decision to admit photographs is within the district court's sound discretion, and this court will not reverse absent an abuse of discretion.[7] Despite gruesomeness, photographs have been held admissible when they accurately show the scene of the crime, the cause of death, or the severity of wounds and the manner of their infliction.[8] We conclude that the district court acted within its discretion in admitting the photograph.

### Sufficiency of the evidence

Mason contends that the evidence presented at trial was insufficient to prove that he shot Thomas and therefore to support the jury's finding that he was guilty of murder. The jury determines the weight and credibility to give conflicting testimony, and the jury's verdict will not be disturbed on appeal where substantial evidence supports the verdict.[9] The question for the reviewing court "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[10]

Mason stresses that the evidence presented at trial was conflicting, particularly his and Jackson's testimony. He points out that Jackson was not truthful in claiming that she had ended her romantic relationship with him long before Thomas's murder.

---

[6]*Bails v. State,* 92 Nev. 95, 96-98, 545 P.2d 1155, 1155-56 (1976) (citing *Holland v. United States,* 348 U.S. 121 (1954)).

[7]*Browne v. State,* 113 Nev. 305, 314, 933 P.2d 187, 192 (1997).

[8]*Theriault v. State,* 92 Nev. 185, 193, 547 P.2d 668, 674 (1976), *overruled on other grounds by Alford v. State,* 111 Nev. 1409, 906 P.2d 714 (1995).

[9]*Bolden v. State,* 97 Nev. 71, 624 P.2d 20 (1981).

[10]*Jackson v. Virginia,* 443 U.S. 307, 319 (1979).

Also, Mason presented witnesses who testified that they saw Jackson trying to sell a gun shortly before the murder that looked like the murder weapon, and he considers it significant that the jury did not convict him of stealing the murder weapon. He also claims that his testimony was corroborated by evidence showing that Thomas kept a machete in his bedroom. He argues that evidence showed that Jackson was hiding from the police when she was under the mattress in the motel room. There was also some indication that Jackson stayed with Mason willingly after the murder. Finally, Mason points out that Brown's description of the gun that he saw Mason holding differed from the color and size of the murder weapon.

The jury, however, heard this evidence and argument and still found that Mason was guilty of murder beyond a reasonable doubt. We conclude that this finding was based on more than sufficient incriminating evidence. In addition to Jackson's eyewitness account of the murder, we note particularly Brown's testimony that Mason arrived just before the murder with a gun asking for Thomas and the testimony of Mason's own cousin that Mason said he was leaving Las Vegas because "he had got him a motherfucker."

*Notice of evidence which the State intends to present at a penalty hearing*

Finally, Mason contends that the State failed to give him notice of all the evidence it intended to present at the penalty phase of the trial, violating SCR 250, and that the district court therefore erred in denying his motion to limit the State's evidence.

In September 1999, the State filed a notice of intent to seek the death penalty, in conformity with SCR 250(4)(c).[11] In August 2000, the State filed a notice "declar[ing] its intention to present the following evidence in support of aggravating circumstance and/or character evidence at a penalty hearing" and specifying a variety of documentary, physical, photographic, and testimonial evidence. This notice was in accordance with SCR 250(4)(f), which provides in part:

> The state must file with the district court a notice of evidence in aggravation no later than 15 days before trial is to commence. The notice must summarize the evidence which

---

[11]SCR 250(4)(c) provides:

No later than 30 days after the filing of an information or indictment, the state must file in the district court a notice of intent to seek the death penalty. The notice must allege all aggravating circumstances which the state intends to prove and allege with specificity the facts on which the state will rely to prove each aggravating circumstance.

the state intends to introduce at the penalty phase of trial, if a first-degree murder conviction is returned, and identify the witnesses, documents, or other means by which the evidence will be introduced. Absent a showing of good cause, the district court shall not admit evidence not summarized in the notice.

On February 27, 2001, the jury returned its verdict finding Mason guilty of murder. Two days later, and four days before the penalty phase began, Mason moved to limit the State's penalty evidence to that identified in the August 2000 notice. The State opposed the motion, and the district court denied it, ruling that SCR 250(4)(f) required notice only of evidence in support of aggravating circumstances, not other evidence admissible at a capital penalty hearing. The court also concluded that the State had "substantially complied" with the notice requirement, assuming it applied, and noted that the defense had not indicated a need for a continuance to address the evidence at issue. As a result, two witnesses not identified in the August 2000 notice testified for the State during the penalty phase. Ronald Kie testified that Mason threw a Molotov cocktail at Kie's house in January 1999, apparently because Jackson was then staying with Kie. Mason's aunt testified that Mason told her in March 1995 that he had shot a man in the back because the man had hit Mason's girlfriend; later he told her that nothing happened to him because there were no witnesses.

The district court concluded and the State asserts that SCR 250(4)(f) applies only to evidence that supports enumerated aggravating circumstances,[12] not other admissible evidence introduced by the State at a capital penalty hearing, because the provision refers to "a notice of evidence in aggravation." They overlook, however, that the provision also expressly requires that notice to summarize "the evidence which the state intends to introduce at the penalty phase of trial."[13] This language is plain and without qualification; it applies to any evidence which the State intends to introduce. Moreover, the district court and the State also overlook this court's case law. In *Emmons v. State*,[14] we considered the appellant's contention

> that just as prior notice to the accused is required before the state can introduce evidence of aggravating circumstances, the due process clause of the United States Constitution also

[12]*See* NRS 200.033 (setting forth "[t]he only circumstances by which murder of the first degree may be aggravated").

[13]SCR 250(4)(f).

[14]107 Nev. 53, 62, 807 P.2d 718, 723-24 (1991), *modification on other grounds recognized by Harte v. State,* 116 Nev. 1054, 13 P.3d 420 (2000).

requires that the state give prior notice of its intent to introduce additional relevant evidence, such as the character evidence at issue here.

We agreed with the appellant and held: "Consistent with the constitutional requirements of due process, defendants should be notified of any and all evidence to be presented during the penalty hearing."[15]

Therefore, the district court erred in admitting the evidence at issue without determining whether there was good cause for not providing notice of it earlier.[16] Nevertheless, no reversible error occurred. SCR 250(4)(f) provides a heightened procedural safeguard for defendants who may be sentenced to death. Had Mason received a death sentence, the State's failure to provide full notice allowing him to prepare to meet the testimony from his aunt and from Kie might have been unfairly prejudicial. We need not make this determination, however. Mason did not receive a death sentence, and aside from the insufficient notice, the evidence in question was otherwise permissible, being relevant to determining his sentence. Therefore, it would have been admissible without prior notice at an ordinary sentencing or a noncapital penalty hearing.[17] As we have explained elsewhere, evidence of unrelated offenses for which a defendant has not been convicted is admissible at a penalty phase unless it is dubious or tenuous or its probative value is substantially outweighed by the danger of unfair prejudice or the other concerns set forth in NRS 48.035.[18] "So long as the record does not demonstrate prejudice resulting from consideration of information or accusations founded on facts supported only by impalpable or highly suspect evidence, this court will refrain from interfering with the sentence imposed."[19] Mason has not argued and the record does not show that the testimony in question ran afoul of these strictures. Therefore, despite the insufficient notice under SCR 250, because the jurors did not return a sentence of death, we conclude that it was permissible for them to consider that testimony in deciding between the other possible sentences.

---

[15]*Id.* at 62, 807 P.2d at 724.

[16]SCR 250(4)(f) ("Absent a showing of good cause, the district court shall not admit evidence not summarized in the notice.").

[17]*See* NRS 175.552(1), (2) (providing that absent waiver by both parties, the court must conduct a separate penalty hearing when a defendant is found guilty of first-degree murder even if the death penalty is not sought).

[18]*See Jones v. State,* 107 Nev. 632, 635-36, 817 P.2d 1179, 1181 (1991).

[19]*Silks v. State,* 92 Nev. 91, 94, 545 P.2d 1159, 1161 (1976).

## *CONCLUSION*

SCR 250(4)(f) requires the State to provide notice of all evidence it intends to introduce at a capital penalty hearing. The district court therefore erred in admitting evidence without determining whether the State had good cause for not providing notice of it earlier. However, the error did not prejudice Mason, nor do his other assignments of error have merit. We therefore affirm his judgment of conviction.